# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KATARA MARKS,          )
                                   )
      **Plaintiff,**       )
                                   )    No. 13 C 2314
**v.**                                 )
                                 )    **Magistrate Judge Sidney I. Schenkier**
**CAROLYN W. COLVIN, Acting**   )
**Commissioner of Social Security,**[1]   )
                                 )
      **Defendant.**     )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Katara Marks seeks reversal and remand of the final determination of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") (doc # 17). The Commissioner has responded, seeking affirmance of the decision denying benefits (doc. # 32). For the following reasons, the Court grants Ms. Marks's motion to remand and denies the Commissioner's motion.

### I.

On July 12, 2010, Ms. Marks applied for SSI, alleging a disability onset date of March 1, 2010 (R. 128). To qualify for SSI, Ms. Marks must show that she was both disabled and financially eligible at any time after the filing of her July 12, 2010 application and prior to the October 13, 2011 Administrative Law Judge ("ALJ") decision. *See* 20 C.F.R. §§ 416.200, 416.202, 416.203, 416.305, 416.335.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security, Carolyn W. Colvin, as the named defendant.

[2]On February 28, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 10, 11).

At the administrative level, Ms. Marks claimed an inability to work due to lupus, depression, numbness in her right side, arthritis in her lower back, weakness, headaches, muscle pains, and swelling (R. 141, 169).[3] Ms. Marks's claims were denied initially, and again upon reconsideration (R. 75-79, 81-84). She requested a hearing before an ALJ, which was granted and held on August 26, 2011 (R. 27-70, 85-86, 98). In a written opinion issued on October 13, 2011, the ALJ concluded that Ms. Marks is not disabled (R. 12-20). Ms. Marks filed an appeal with the Appeals Council, and also submitted additional medical records for review (R. 7, 186-92, 677-1069). The Appeals Council denied Ms. Marks's request for review of the ALJ's decision (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. We review Ms. Marks's general background in Part A; her medical records in Part B; the hearing testimony in Part C; the ALJ's written opinion in Part D; and the Appeals Council's denial of review and additional medical evidence submitted to the Appeals Council in Part E.

## A.

Ms. Marks was born on May 11, 1992, and was 19 years old at the time of the hearing (R. 27, 128, 178). She began seeking treatment for lupus in 2008 (R. 145). At the time of the hearing, Ms. Marks had just graduated from high school (R. 178), and was to begin studying at Robert Morris University that coming fall, in September of 2011 (R. 30). She currently lives in an apartment with her mother and grandmother and does not contribute to rent (R. 129). Ms.

---

[3]"Systemic lupus erythematosus (SLE) is an autoimmune disease in which the body's immune system mistakenly attacks healthy tissue." http://www.nlm.nih.gov/medlineplus/ency/article/000435.htm.

Marks only has part-time work experience as an assistant in a senior assisted living facility during the summers of 2008 through 2011 (R. 133, 178). She has no other work experience (*Id.*).

Kathy Marks, Ms. Marks's mother, completed a function report for her daughter (R. 150-157). She reported that her daughter goes to and from school and church on a regular basis and goes outside "every day" (R. 151, 153, 154). She does not drive, but she uses car rides and public transportation (R. 153). She is able to go to the store and shop for clothes and shoes (*Id.*). Ms. Marks needs to be reminded to take her medicine, does not prepare her own meals, but is able to do laundry, ironing, and cleaning every other month, though her mother observes that it takes her "hours to do [them]" (R. 152). Ms. Marks does not pay the bills, but she can handle money (R. 153). She watches television and socializes with others over the phone and on the computer (R. 154), though her mother notes that Ms. Marks prefers "to be by herself" (R. 155).

Kathy Marks opined that her daughter's conditions affect her ability to lift, squat, bend, stand, sit, kneel, climb stairs, see, complete tasks, memorize, understand, follow instructions, and get along with others (R. 155). Kathy Marks also explained that her daughter only can walk for 15 to 20 minutes before needing to rest for 30 minutes; can only pay attention for 10 to 15 minutes; does not finish what she starts; has trouble following written and spoken instructions; can get along with authority figures; does not handle stress and changes in routine "very well"; and wears glasses since May 12, 2010 (R. 155, 156). Her mother also wrote that Ms. Marks has never "been fired or laid off from a job because of problems getting along with other people" (R. 156).

Ms. Marks also made available records from her high school (R. 665-76). The records show that Ms. Marks was granted numerous educational accommodations under a "504 Plan" (R.

666).[4]  The school records also indicate that during the 2010-2011 school year, Ms. Marks had seven excused and eighteen unexcused absences and one tardy by January 25, 2011 (R. 667).

## B.

The original medical record contains treatment records from May 12, 2010 through May 19, 2011 (R. 193-664), indicating initial diagnoses of lupus nephritis in April of 2008, headache and depression in May of 2008, and radiculopathy in April of 2010, among other lesser diagnoses (R. 221, 222, 237).[5]  Treatment records also indicate that Ms. Marks was taking seventeen different medications for her condition as of June 21, 2010.[6]

The medical record begins with an eye examination conducted by Eric Conley, O.D., on May 12, 2010 (R. 199-205).  Ms. Marks complained of headaches, eye irritation, blurry vision, eye strain, tinnitus (ringing in ears), vertigo, and nausea (R. 199, 201).  On June 21, 2010, Ms. Marks returned complaining of flashes and floaters in her vision and arm discomfort (R. 197). Dr. Conley diagnosed her with proliferative retinopathy[7] secondary to systemic lupus erythematosus ("SLE") (R. 198).

---

[4] A 504 Plan takes its name from Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits educational programs receiving federal funds from excluding, denying benefits, or discriminating against any person whose disability substantially limits a major life activity. http://www.specialchildren.about.com/od/504s/f/504faq1.htm.  Such a plan establishes modifications and accommodations to enable a student to have the same opportunities to perform at school as her peers.  Modifications may include a wide variety of accommodations such as home instruction, special seating, or extra time for test-taking.

[5] Radiculopathy is "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." http://www.merriam-webster.com/dictionary/radiculopathy.

[6] The medications Ms. Marks was taking were Pataday (eye drops, once in each eye per day); calcium (1200 mg daily); Tylenol (650 mg every 6 hours, as needed for pain); Benadryl (50 mg as needed for itching and insomnia); Prevacid Solutab (30 mg daily); Drisdol (one capsule per week); aspirin (81 mg per day); Plaquenil (400 mg daily); Prednisone (5 mg daily); CellCept (1000mg twice daily); Tenormin (25 mg daily); Nortriptyline (10 mg daily at night); Benzamycin (apply topically daily); Aclovate (apply topically 2 times daily); Vasotec (10 mg daily); Priolsec OTC (20 mg DR tablet daily); and Excedrin OR (for migraines as needed) (R. 206, 207).

[7] Retinopathy is "any of various noninflammatory disorders of the retina[,] including some that cause blindness." http://www.merriam-webster.com/medical/retinopathy?show=0&t=1403206936.

4

Ms. Marks was treated by rheumatologist Marisa S. Klein-Gitelman, M.D., on June 17, 2010 at Children's Memorial Hospital ("CMH") (R. 206-09, 216-32, 251-58, 339-42). Dr. Klein-Gitelman assessed Ms. Marks with stable SLE, and began tapering her medication (R. 208, 342). On June 29, 2010, Ms. Marks was seen by gastroenterologist Maria T. Greene, M.D., for abdominal pain (R. 210-15, 233-50). Dr. Greene reported that Ms. Marks's symptoms had improved with medication, and that her abdominal pain did not restrict her from performing daily activities (Id.).

On August 16, 2010, Ms. Marks was assessed by nephrologist Jerome C. Lane, M.D., at the CMH Division of Kidney Diseases (R. 351-54). Ms. Marks complained of occasional headaches, chest palpitations, worsening lymph node swelling in her neck, and rashes on her face (R. 352). Dr. Lane noted normal kidney function, no hematuria (blood in urine), and no proteinuria (high levels of protein in urine) (Id.). He diagnosed her with SLE and "Class III/V lupus nephritis with good symptomatic control" and made no changes to her treatment plan (Id.). Ms. Marks followed up with Dr. Klein-Gitelman on September 2, 2010, complaining of chest pain (R. 259-67, 360-64). Dr. Klein-Gitelman noted that Ms. Marks was "[d]oing well" (R. 362), and began tapering her Prednisone (R. 364).

On September 22, 2010, consulting psychologist Robert Neufeld, Ph.D., completed a psychological report on Ms. Marks (R. 268-71). Mr. Neufeld observed that Ms. Marks was "generally somewhat flat and submissive emotionally . . . [self-describing] her mood as 'irritated'" (R. 268-69). He concluded Ms. Marks was "a pleasant eighteen-year old female who presents with mild flat/dysphoric affect," and diagnosed her with "dysthymic disorder"[8] (R. 270). On October 18, 2010, state agency consulting psychiatrist Elizabeth Kuester, M.D., examined

---

[8] A dysthymic disorder is a mild but chronic form of depression. http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879.

Ms. Marks (R. 272-85). Dr. Kuester opined that Ms. Marks's dysthymic disorder did not affect her activities of daily living but mildly affected her ability to "maintain social functioning" and "concentration, persistence, or pace" (R. 275, 282).

On October 21, 2010, state agency consulting physician Marion Panepinto, M.D., reviewed Ms. Marks's medical records and assessed her residual functional capacity ("RFC") (R. 286-93). Dr. Panepinto opined that Ms. Marks could lift twenty pounds occasionally and ten pounds frequently, could stand/walk about six hours and sit about six hours in an eight-hour work day, and had no limitations on her ability to push or pull (R. 287). Dr. Panepinto also wrote that Ms. Marks had no postural, manipulative, visual, communicative, or environmental limitations (R. 288-90). She noted that Ms. Marks was "partially credible" as there were objective medical findings compatible with her alleged problems (R. 293). Dr. Panepinto's RFC was affirmed by state agency consulting psychologist Ronald Havens, Ph.D., on December 30, 2010, and by state agency consulting physician Towfig Arjmand, M.D., on January 3, 2011 (R. 294-96).

On December 2, 2010, Ms. Marks returned to Dr. Klein-Gitelman complaining of cold symptoms and a headache (R. 355-59, 608-17). Dr. Klein-Gitelman noted Ms. Marks had "tender and painful" lymph nodes, but no "mouth sores, nose sores, rashes, chest or abdominal pain, or fatigue" (R. 356-57). Dr. Klein-Gitelman was concerned Ms. Marks might have a "lupus flare" (R. 357). After reviewing the results of laboratory tests, Dr. Klein-Gitelman opined that "[l]upus serology [was] better than expected" and began tapering steroid medications (R. 359).

From December 15 through December 20, 2010, Ms. Marks was admitted to CMH for inpatient treatment following complaints of frequent urination, back and abdominal pain, and

bloody urine (R. 343-50, 366-410). She was diagnosed with pyelonephritis and discharged after five days (R. 369).[9] On January 12, 2011, Ms. Marks was seen again at the CMH emergency room, complaining of intermittent headaches and abdominal pain (R. 414-23). The doctors noted neutropenia in otherwise normal blood and urine tests (R. 416).[10] She was discharged the same day after her medication was increased (R. 416, 417).

From January 20 through January 28, 2011, Ms. Marks was admitted again to CMH for inpatient treatment following complaints of lightheadedness, headache, and right-sided weakness (R. 425-552). Her doctors noted "lab results were consistent with a serologic lupus flare," and ruled out a stroke based on an MRI and CT scan of the brain (R. 425, 427). She was discharged after her medication was increased (*Id.*). Ms. Marks's symptoms were assessed as secondary to complex migraine (R. 428).

Ms. Marks was readmitted to CMH three days later, on January 31, 2011, for abdominal pain, a left-sided headache, and right arm swelling, numbness, and tingling (R. 554-606). The hospital increased her medication after an EKG (R. 556). She was discharged on February 4, 2011 after her symptoms were assessed as secondary to complex migraine (R. 557).

On February 10, 2011, Ms. Marks followed up with Dr. Klein-Gitelman, who noted that Ms. Marks's headaches were "much better controlled" (R. 310-14, 617-26). Ms. Marks reported that she was able to sleep through the night but had felt fatigue for the past two days (R. 617-18). She also complained of new mouth lesions and "morning stiffness" in her right knee (*Id.*). Dr. Klein-Gitelman observed that the rashes on Ms. Marks's palms and soles were "improved and

---

[9]Pyelonephritis (kidney infection) "is a specific type of urinary tract infection (UTI) that generally begins in your urethra or bladder and travels up into [the] kidneys." http://www.mayoclinic.org/diseases-conditions/kidney-infection/basics/definition/con-20032448.

[10]"Neutropenia . . . is an abnormally low count of neutrophils, a type of white blood cell that helps fight off infections, particularly those caused by bacteria and fungi." http://www.mayoclinic.org/symptoms/neutropenia/basics/definition/sym-20050854

not painful anymore" (*Id.*). She also noted Ms. Marks had full strength in all extremities (*Id.*). Ms. Marks reported that she had returned to school for half days and would slowly increase time spent in school (*Id.*). Dr. Klein-Gitelman assessed Ms. Marks with a stable rash, mild stiffness of the right knee, and thyroid fullness (*Id.*).

On February 21, 2011, Ms. Marks was seen by Dr. Lane (R. 626-33). Dr. Lane noted Ms. Marks was "feeling better" after her hospitalization two weeks prior, and that her abdominal pain and headaches were managed well with medication (R. 628). He assessed her with "excellent kidney function and blood pressure," with normal urine and blood tests (R. 629).

On March 17, 2011, Ms. Marks was seen by Dr. Klein-Gitelman, who assessed Ms. Marks with a mildly swollen knee and mild abdominal pain, but noted Ms. Marks's lupus serology had improved, and began tapering steroid medications (R. 305-09, 633-42). Ms. Marks followed up on April 14, 2011 for a new onset of rash (R. 300-04, 642-51). Dr. Klein-Gitelman assessed Ms. Marks with herpes zoster, described Ms. Marks's lupus serology as "currently stable," and began reducing steroid medications (R. 304).

On April 20, 2011, Ms. Marks was seen at CMH by neurologist Mark S. Wainwright, M.D., for migraine headaches and SLE (R. 297-99, 651-59). She complained of throbbing headaches and nausea approximately two to three times a week, lasting from a few hours to a full day, but no other episodes of weakness since her hospitalizations earlier in the year (R. 297). She presented to Dr. Wainwright with a migraine headache that caused her a pain level of 6 to 7 on a scale of 1 to 10 and that caused loss of sensation near the left eyebrow (*Id.*). Dr. Wainwright confirmed this decrease in sensation in his physical exam (R. 298). He noted Ms. Marks had normal cognitive function, motor skills, reflexes, coordination, and gait (*Id.*). He

opined that Ms. Marks's headaches were not managed well with current medications, and recommended increasing her medications (*Id.*).

## C.

At the hearing before the ALJ on August 26, 2011, Ms. Marks (who was represented by counsel) testified, as did her mother and a vocational expert (R. 27). Ms. Marks stated that she is not married, has no children, and lives with her mother (R. 30). She recently graduated from high school and planned to attend Robert Morris University starting in September of 2011 (*Id.*). In high school, Ms. Marks had a specialized education plan (504 Plan), which gave her extra time for assignments and tests (R. 33). She testified that she was only able to graduate because of the 504 Plan since without it her numerous absences would have otherwise been unexcused (*Id.*). Ms. Marks was assigned a tutor during her senior year to help her with her school work after her hospitalizations (R. 53-54). She anticipated having a 504 Plan in place to help her with her college work (*Id.*). Ms. Marks recently completed a summer job working at a supportive living facility (R. 31). Her responsibilities included making copies, answering phones, and typing memos (R. 32). She worked four hours a day, three days a week (R. 32-33). She described the work as untrained, with most of her time spent sitting (R. 37-38).

When she is not working or in school, Ms. Marks stated that she sleeps, rests, or hangs out with her friends (R. 35). She socializes with friends approximately once a month, asserting that she cannot do so more often because of her medical condition (R. 51-52). Ms. Marks also spends her free time talking to friends on the phone, watching television, and using a computer (R. 36-37). She previously played flag football and ran track but stopped once her health deteriorated (R. 37). She also previously enjoyed braiding hair but is currently unable to do so

because her "lupus has progressed" (R. 57). She takes hour-and-a-half to two hour naps each day and sleeps for approximately twelve hours at night (R. 58).

Ms. Marks testified that she is only able to sit for about an hour before needing to rest (R. 39). She also cannot walk more than half a block without losing her breath and experiencing right knee pain (*Id.*). Ms. Marks stated she usually sits down and drinks water for ten minutes before continuing (R. 39-40). She also testified that she can lift a gallon of milk (which the ALJ opined weighed approximately eight pounds) and can carry it about twenty feet (R. 40). Ms. Marks does not prepare her own meals, although she does help her mother with washing the dishes, cleaning the bathroom, and doing her own laundry (R. 41-42). When leaving from or returning to the house, Ms. Marks is usually accompanied by her mother, her aunt, or friends (R. 42-43). She plans to live on campus in a dormitory with roommates to avoid any problems with getting to and from school (R. 43).

Ms. Marks testified that she had Lasik eye surgery in the Fall of 2010, and currently uses prescription eye drops to keep her eyes from getting dry (R. 44). Ms. Marks stated that her medications make her dizzy, sleepy, and faint, and she usually rests after taking her medication regardless of whether she is at school or at home (R. 47). Ms. Marks also reported headaches once or twice a week that were triggered by stress (R. 48). She stated the headaches sometimes last the whole day or longer (R. 54-55). She reported the headaches are managed with medication, but she must go in for IV medications every three weeks (R. 55). She missed two days of high school a week because of her various medical conditions (R. 48-49). Ms. Marks states that because of her headaches and lupus flares, she would miss five to six days of work at a new job each month (R. 59).

Ms. Marks's mother, Kathy Marks, also testified at the hearing (R. 60). Kathy Marks stated that after the hospitalization in January, her daughter began receiving IV prednisone treatments biweekly, eventually tapered to every third week (R. 61). She testified that her daughter's condition was getting worse (R. 61, 62). She also reported that her daughter's muscles "shut down" during lupus flares, leaving her unable to move (R. 62). She also stated that when her daughter is not at school or at her summer job, she is resting at home and that she gets migraine headaches once or twice a week (R. 63).

Vocational expert Lee Knudson also testified (R. 64). The ALJ asked Mr. Knudson to describe the work available to a younger individual with a high school education and no past work experience who could lift and carry ten pounds occasionally and less than ten pounds frequently, and could use her hands for frequent (but not constant) handling and manipulation (R. 65). In addition, the individual could be on her feet standing or walking about two hours and sitting six hours with normal rest periods in an eight-hour workday, but can only occasionally crouch, kneel, or crawl and is unable to work at heights, climb ladders frequently, or be exposed to extreme cold (*Id.*). Mr. Knudson stated that sedentary, unskilled positions would be available to such an individual, such as assembler, order clerk, and cashier (R. 66). However, he testified that the individual would have to be on task at least 86 to 90 percent of the time, and could not consistently be absent more than 10 percent of the time, meaning approximately three days a month (R. 67-68). If such an individual could not meet the on-task or attendance requirements of the positions as outlined, Mr. Knudson testified that he did not think such an individual "could perform in a regular unskilled job" (R. 68). The ALJ and counsel for Ms. Marks did not pose any other hypotheticals to Mr. Knudson (*Id.*).

**D.**

On October 13, 2011, the ALJ issued a written decision finding Ms. Marks not disabled and denying her benefits (R. 12-20). In evaluating Ms. Marks's claim, the ALJ applied the five-step sequential evaluation process for determining disability, which requires the ALJ to consider whether: (1) the claimant has engaged in any substantial gainful activity since the alleged disability onset date; (2) her impairment or combination of impairments is severe; (3) her impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) her residual functional capacity ("RFC") prevents her from performing past relevant work; and (5) her RFC prevents her from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), (b)-(f); 416.920(a).

At Step 1, the ALJ determined that Ms. Marks had not engaged in substantial gainful activity since her application date of June 24, 2010 (R. 14). Next, at Step 2, the ALJ found that Ms. Marks's severe impairments were systemic lupus erythematosus and proliferative retinopathy (*Id.*). The ALJ noted Ms. Marks's depression did "not cause more than minimal limitation in [her] ability to perform basic work activities and [was] therefore nonsevere" (*Id.*). At Step 3, the ALJ determined that Ms. Marks's impairments did not meet or medically equal a listed impairment (R. 14, 15).

The ALJ then determined that Ms. Marks has the RFC to perform "sedentary work," can lift and carry ten pounds occasionally and less than ten pounds frequently, can use her hands for frequent handling and manipulation (but not constantly), and can stand/walk about two hours and sit about six hours in an eight-hour workday, with normal rest periods (R. 15). The ALJ further noted that Ms. Marks is unable to work at heights or frequently climb ladders, may only

occasionally crouch, kneel, or crawl, and should avoid concentrated exposure to extreme cold (*Id.*).

At Step 4, the ALJ determined that Ms. Marks has no past relevant work (R. 18). At Step 5, the ALJ determined that Ms. Marks can perform "jobs that exist in significant numbers in the national economy" given her "age, education, work experience, and residual functional capacity" (R. 18-19). The ALJ therefore concluded that Ms. Marks is not disabled (R. 19).

## E.

Following the ALJ's decision, Ms. Marks filed an appeal with the Appeals Council on December 8, 2011, asserting that the ALJ erred in his decision by failing to: (1) properly assess Ms. Marks's impairments; (2) properly assess her impairments (or combination of impairments) as meeting or equaling a listing; (3) have a medical expert review the more recent medical records; and (4) find that Ms. Marks's migraine headaches constitute a severe impairment. Further, Ms. Marks argued that substantial evidence did not support the ALJ's decision (R. 186-89). Ms. Marks submitted more medical records to the Appeals Council for review on February 17, 2012 and July 23, 2012 (R. 191). These supplemental medical records account for Ms. Marks's medical treatment from June 2011 through July 2012 and are summarized below (R. 677-1069).

Ms. Marks visited the emergency room or was admitted to the hospital on multiple occasions between August 2011 and July 2012 for complaints associated with her SLE and migraine diagnoses. On August 11, 2011, Ms. Marks presented to the emergency room for medication refills and evaluation of her symptoms, which included headache, abdominal pain and joint pain (R. 680). On November 21, 2011, she arrived back at the emergency room complaining of facial rash and swelling (R. 683). She was diagnosed with a lupus flare (*Id.* at

685). On November 29, 2011, Ms. Marks was admitted to CMH for two days to address symptoms associated with another flare (R. 1050). She was admitted to CMH from January 3 through January 7, 2012 for another SLE flare (R. 979). She received inpatient care from the rheumatology department on February 7, 2012, and the medical notes from that episode refer to two hospitalizations subsequent to a January 13, 2012 appointment with Dr. Sengupta (for which the Court can find no documentation) (R. 749, 804). The record further reveals that Ms. Marks was admitted for observation at Stroger Hospital between May 14 and May 17, 2012 for worsening SLE symptoms, including fatigue, dizziness, and fever (R. 728). She was admitted again for vision problems secondary to SLE from May 29 to June 2, 2012 (R. 733). Ms. Marks was admitted to Stroger for more than a month from June 11 through July 16, 2012 for complications associated with her SLE (R. 961). Finally, she was admitted on July 20 and July 27, 2012 for IV medication administration (R. 966, 971).

Ms. Marks was also seen by specialists throughout this period. She was seen by rheumatologist Mondira Sengupta, M.D., four times from August 2011 through December 2011.[11] Ms. Marks was also treated by rheumatologist Augustine Manadan, M.D., sixteen times between February 7 and June 2012.[12] Her rheumatologists noted worsening symptoms from August 2011 through July 2012, and attempted to stabilize Ms. Marks through aggressive medication management. Ms. Marks visited neurologist Michael Kelly, M.D., on November 16, 2011 for evaluation of her headaches (R. 719-22), and dermatologist Mona Gandhi, M.D., on

---

[11]Ms. Marks visited Dr. Sengupta on August 16, 2011 (R. 713-718), November 22, 2011 (R. 707-12), December 1, 2011 (R. 703-06), and December 23, 2011 (R. 699-702).

[12]Ms. Marks visited Dr. Manadan on February 7, 2012 (R. 749-754), March 2, 2012 (R. 808-11), March 12, 2012 (R. 810, 816-19), March 19, 2012 (R. 812-815), March 21, 2012 (R. 820-23), March 26, 2012 (R. 824-27), April 2, 2012 (R. 828-33), April 9, 2012 (R. 831, 834-36), April 17, 2012 (R. 841-43), April 23, 2012 (R. 837-40), April 30, 2012 (R. 844-47), May 7, 2012 (R. 848-51), May 21, 2012 (R. 857-60), May 29, 2012 (R. 862-66), June 4, 2012 (R. 867-72), and June 11, 2012 (R. 873-75).

March 23, 2012 to address her rashes (R. 779). Ms. Marks was also seen by ophthalmologic

nurse Vivian Jann, R.N., and ophthalmologist Dr. Hong on June 4, 2012 (R. 781-82).

On January 28, 2013, the Appeals Council denied Ms. Marks's request for review. In so

doing, the Appeals Council stated only that it "found no reason under our rules to review the

Administrative Law Judge's decision" (R. 1).

### III.

Following the Appeals Council's denial of review, Ms. Marks filed this appeal, asserting

that the Appeals Council improperly refused to review the ALJ's decision following her

submission of "new and material evidence" (Pl.'s Mem. in Supp. Mot. Summ. J. ("Pl.'s Mem.")

at 8-9 (doc. # 18)), and that the ALJ further erred by: (1) failing to provide appropriate rationale

for rejecting her testimony; (2) substituting his own opinion for that of a qualified medical

expert; (3) selectively quoting the evidence of record; and (4) failing to support his decision with

substantial evidence (*Id*. at 10-14). For the reasons stated below, we agree that the Appeals

Council improperly refused to review the ALJ's decision following Ms. Marks's submission of

"new and material evidence," and grant Ms. Marks's motion on that ground.

### A.

Ms. Marks objects to the Appeals Council's refusal to review the ALJ's decision, arguing

that she submitted "new and material evidence" spanning the time period between June of 2011

and July of 2012 that should have resulted in the Appeals Council's review under 20 C.F.R. §

404.970(b). The Court reviews *de novo* the Appeals Council's decision to deny review of the

ALJ's decision. *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012).

The Appeals Council denied review of Ms. Marks's claim on the basis that it "found no

reason under our rules to review the [ALJ's] decision" (R. 1). Because the Appeals Council did

not articulate which rules it considered in making this decision, we are left to determine what the Appeals Council meant by this cryptic language. In *Farrell*, the Seventh Circuit interpreted similarly ambiguous language to mean that the Appeals Council found the additional information to be "non-qualifying under the regulations." 692 F.3d 771. Pursuant to *Farrell*, we likewise find that the Appeals Council rejected Ms. Mark's additional documentation on the grounds that it was "non-qualifying."

In light of this conclusion, we turn to 42 U.S.C. § 405(g), which permits the remand of a case to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Our task, then, is to consider whether the additional evidence Ms. Marks submitted to the Appeals Council is: (1) new, (2) material, and (3) submitted late with good cause.

### 1.

Additional evidence is considered "new" if it was "not in existence or available to the plaintiff at the time of the administrative proceeding." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). With this standard in mind, the district court in *Bush v. Astrue*, 571 F. Supp. 2d 866, 874 (N.D. Ill. 2008), found additional medical evidence to be "new" where the evidence pertained to testing and test results conducted and obtained after the ALJ rendered his decision. By contrast, in *Schmidt v. Barnhart*, 395 F.3d 737, 742-42 (7th Cir. 2005), the Seventh Circuit held that additional information submitted to the Appeals Council was not "new" where it in fact existed prior to the ALJ's decision but simply had not been submitted in a timely fashion. Similarly, the Seventh Circuit in *Perkins* declined to characterize a physician report as "new" evidence where the report—while "technically not in existence at the time of the earlier hearing"—was based entirely on the medical record as it existed prior to the ALJ's hearing. 107

F.3d at 1296. In that instance, the Court viewed the evidence as merely "derivative" of existing information. *Id.; see also Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993) (additional medical evidence submitted to the Appeals Council was not "new" where a letter from the treating physician was based on information that was part of the administrative record and available prior to the ALJ's decision).

In this case, with only three exceptions,[13] the information submitted to the Appeals Council was based on events that occurred only after the ALJ rendered his October 13, 2011 decision. The large number of documents Ms. Marks submitted were not reports merely derived from existing medical records, but were independent records pertaining to hospital admissions and appointments with rheumatologists, neurologists, and ophthalmologists that occurred between November 2011 and July 2012. Therefore, with the exception of Ms. Marks's August 11, 2011 emergency room visit and her two doctors' appointments, the Court finds that the remaining evidence submitted by Ms. Marks to the Appeals Council is "new" under Section 405(g).

## 2.

The "new" evidence must also be "material" under Section 405(g) in order to provide a basis for remand. Evidence is considered "material" if there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt*, 395 F.3d at 742. Further, the evidence must relate to the claimant's condition "during the relevant time period encompassed by the disability application under review." *Id.* Evidence that "speak[s] only to the applicant's current condition, [and] not to [her] condition at the time [her]

---

[13]By this Court's count, these exception are: (1) an appointment with family practice physician Dr. Ahomka-Lindsay on June 20, 2011 (R. 723); (2) an emergency room visit on August 11, 2011 for a medication refill (R. 680); and (3) an outpatient appointment with rheumatologist Dr. Sengupta on August 16, 2011 (R. 713).

application was under consideration by the Social Security Administration," is not considered "material." *Id.*

In *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008), the Seventh Circuit considered whether medical evidence submitted to the Appeals Council pertaining to the claimant's gout spoke to the claimant's condition at the time of the ALJ's consideration, and thus was material. The appeals court concluded that the records, which catalogued the claimant's worsening condition in 2004 and 2005, and thus after the ALJ rendered his decision, were not "material" because they did not relate to the claimant's condition at the time of the ALJ's decision. *Id.* at 484. Relevant to this outcome was the ALJ's minimization of the severity of the claimant's gout given a complete absence of medical evidence documenting gout flare-ups or symptomology. *Id.* at 483; *see also Schmidt*, 395 F.3d at 742 (new medical records were not material where they documented plaintiff's condition as it existed one to three years after the ALJ rendered his decision); *Godsey v. Bowen*, 832 F.2d 443, 444-45 (7th Cir. 1987) (new evidence documenting plaintiff's condition three years after the administrative hearing was not material).

A different result ensues when the new documents at issue post-date the ALJ's decision by a minimal amount of time and reflect treatment for long-standing conditions. In *Bush*, the court concluded that a CT scan of the plaintiff's spine, conducted only a few weeks after the ALJ's hearing, met the definition of "material" because it encompassed the time period under review by the ALJ. 571 F. Supp. 2d at 874-75. Other new evidence, including examinations, tests, and treatment records that post-dated the ALJ's decision by three months or less likewise was found to be material "[g]iven the minimal lapse of time between the testing and the ALJ's decision" and the fact that the documents reflected impairments "of which [the] plaintiff had been complaining for years." *Id.* at 875. Similarly, in *Sears v. Bowen*, 840 F.2d 394, 400–01

(7th Cir. 1988), the Seventh Circuit concluded that a report made more than a year after the ALJ's hearing was material where the treatment documented in the report began one month after the ALJ's hearing and the report indicated that the plaintiff's psychiatric problems were long-standing.

Together, these cases indicate that new information is more likely to be "material" when it is dated relatively close in time to the ALJ's hearing and sheds light on long-standing medical conditions that were at the fore of the ALJ's determination. In such an instance, there is a reasonable probability that the ALJ would have reached a different conclusion had he considered the additional evidence. *See Schmidt*, 395 F.3d at 742.

In this case, we find that the additional medical evidence submitted to the Appeals Council is material. *First*, the evidence arose close in time to the ALJ's decision: two hospital visits occurred five and six weeks, respectively, after the ALJ's decision, and at least five more followed within the subsequent eight-month period. The various medical records pertaining to Ms. Marks's numerous doctors' visits span the time-period between November 2011 and July 2012. All of the records fall within a nine-month time period following the ALJ's decision.

*Second,* the additional evidence sheds direct light on the severe medical conditions addressed by the ALJ in his decision. The ALJ determined that Ms. Marks had two severe impairments: systemic lupus and proliferative retinopathy. All of the hospital records and physician notes from her many appointments with rheumatologists, neurologists, ophthalmologists and other specialists relate to and shed light upon these same severe impairments, particularly lupus. Ms. Marks's lupus had flared between December 2010 and February 2011, resulting in her being hospitalized on three different occasions for a total of 18

days (R. 343-50, 366-410, 425-552, 554-606). Moreover, the flare-up that Ms. Marks suffered after the ALJ's October 2011 decision was not unprecedented.

*Third*, we find there is a reasonable probability that the ALJ would have reached a different conclusion had he considered these documents. The ALJ made clear in his decision that he considered Ms. Marks's allegations of disabling symptoms and limitations to be unsupported by the objective medical findings (R. 16). He noted repeatedly throughout his opinion that he found Ms. Marks's lupus to be "stable" or "under good symptomatic control" (R. at 16). He also found that Ms. Marks was discharged from the hospital "in stable condition;" that testing resulted in "no remarkable findings;" and that "there were no complications" (*Id.* at 16-17). However, the additional medical records tell a substantially different story. By Ms. Marks's count, she was hospitalized for 55 days between January and July 2012 (Pl.'s Mem. at 9), and by our own reckoning we find this accounting to be accurate, or nearly so. She suffered several lupus flares in the month following the ALJ's decision. She was seen by doctors on an almost weekly basis beginning in November 2011 and was hospitalized at least five times, and perhaps more, between November 2011 and July 2012. One hospitalization lasted for over a month while doctors worked to manage her lupus-related symptoms, including anemia, lupus vasculitis affecting the vision of her left eye, pancytopenia (reduction in number of red and white blood cells), and thrombocytopenia (reduction in the number of blood platelets) (R. 967). These documents do not paint a picture of a woman who, according to the ALJ, was "under good symptomatic control," having no complications, or in "stable" condition" (R. 16-17).[14] In fact,

---

[14] In the medical realm, the adjective "stable" is defined as "not getting worse or likely to get worse." www.merriam-webster.com/dictionary/stable. The Seventh Circuit recently evaluated this word, and its import within the context of Social Security disability, in *Murphy v. Colvin*, --F.3d--, No. 13-3154, 2014 WL 3586260 (7th Cir. Jul. 22, 2014), and concluded that "[s]imply because one is characterized as "stable"... does not necessarily mean that she is capable of doing... work." *Id.* at *6. Further elaborating, the Court noted that a claimant could be in "terrible condition" immediately following a stroke and yet still be characterized as "stable" by her doctors. *Id.* We find this clarification to be particularly apt in this case, where the ALJ routinely referenced Ms. Marks's

they undermine these conclusions and lead us to believe that a review of Ms. Marks's new evidence could very well result in a different outcome. *See Stubbs v. Apfel*, No. 97 C 7069, 1998 WL 547107, at *10 (N.D. Ill., Aug. 20, 1998) (new clinical evidence was found material where it documented the severity of the claimant's impairment following the ALJ's conclusion that the claimant's testimony regarding the severity of her limitations was not fully credible).

The new evidence suggests a reasonable likelihood of a different outcome for an additional reason: it strongly indicates that Ms. Marks's condition would cause her to exceed the maximum number of absences from work allowed to maintain employment. Ms. Marks testified at the hearing that she believed she would miss five or six days a week on account of migraines (R. 59). She testified that she naps every day and is aware of her doctors' orders not to stress or put pressure on herself because those are triggers for her headaches and lupus (*Id.* at 58). The VE testified at the hearing that a person who routinely misses two days or more of work each month would not be employable (R. 68). But despite this testimony, the ALJ found most persuasive Ms. Marks's ability to sustain a part-time summertime work schedule and consequently found that she is able to do full-time sedentary work (R. 16-17).

The problem with the ALJ's analysis is that the ability to hold a part-time job of four hours a day, three days a week does not come close to equating with being up to performing a full-time job of eight hours a day, five days a week. *See Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (discussing the troubling tendency of administrative law judges to equate "the ability to engage in some activities with an ability to work full-time, without a recognition that

"stability" and equated it with an overall ability to engage in sedentary work, even though the term was used by her doctors to describe her medical condition or her status upon discharge from the hospital. Such an approach runs afoul of the Court's observation in *Murphy* that a person can suffer considerable limitations preventing gainful employment and yet still be considered "stable" because her condition is not volatile. On remand, the ALJ should re-evaluate whether Ms. Marks truly had (or has) achieved stability relative to her lupus and, if so, whether her stability then translates into an ability to engage in substantial gainful employment, or whether she remains in poor health and incapable of full-time work despite having reached a point where she is not getting worse or is not likely to get worse.

full-time work does not allow for the flexibility to work around periods of incapacitation"); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (finding itself "hardpressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations").

In addition, the new evidence bears directly on the ALJ's finding that Ms. Marks was not credible when she testified that she would miss an amount of work each month that was prohibitive of full-time employment. Whether this amount is five days or two days a month, the new evidence lends weight to Ms. Marks's assertions that she could not work a normal job on account of repeat absences. Given Ms. Marks's extensive hospitalizations in 2011 and 2012 and her need for constant monitoring by physicians, there is reason to believe that the ALJ would view Ms. Marks's employability differently had he been privy to this additional medical information.

### 3.

Finally, Section 405(g) requires a claimant to show "that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Ms. Marks does not address this requirement, and thus has waived any argument that the requirement has been met. *See U.S. v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived."). But, even had the Commissioner raised this point, it would not have carried the day. Good cause is evident here, as almost all the documents submitted to the Appeals Council as new evidence did not exist at the time of the ALJ's hearing. *See Creighton v. Sullivan*, 798 F. Supp. 1359, 1363 (N.D. Ind. 1992) (finding good cause where medical report did not exist until after the Appeals Council had denied claimant's claim)*; Haralson v. Colvin*, No. 12 C 7084, 2014 WL

2808983, at *8 (N.D. Ill., June 20, 2014) (good cause requirement met as to sleep study that was ordered before ALJ's hearing but not conducted until after ALJ's decision was issued).

Furthermore, Ms. Marks has been diligent in her submission of additional documents and there is no evidence of administrative misconduct. *See Sears v. Bowen*, 840 F.2d 394, 400 (7th Cir. 1988) (finding good cause where there was no evidence of "'sandbagging' by a claimant who loses and hopes to get another chance at obtaining benefits by bringing in new evidence"); *Stubbs*, 1998 WL 547107, at *11 (finding good cause where facts demonstrated no bad faith manipulation of administrative processes by the plaintiff). Regarding the few medical records that pre-dated the ALJ's hearing and decision (*see* footnote 13), we note that although Ms. Marks had an obligation to explain to the Court why these documents were not made a part of the record before the ALJ closed the proceedings, we see no good reason to remove these few documents (only about 11 pages out of hundreds submitted) from the ALJ's consideration on remand.

**B.**

Because we remand this case on the basis of the Appeals Council's failure to evaluate Ms. Marks's post-hearing medical evidence, we need not address Ms. Marks's remaining arguments, which pertain to issues of credibility, cherry-picking of evidence, and "playing doctor." All of these issues will be affected by the new medical evidence and thus need not be evaluated by this Court.

**CONCLUSION**

For the reasons set forth above, we grant Ms. Marks's motion for remand (doc. # 17), and we deny the Commissioner's motion to affirm (doc. # 32). On remand, the ALJ should examine

the additional medical evidence that was submitted to the Appeals Council. This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: August 21, 2014